IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: ) | Chapter 11 |
| ) | Case No. 20-12067 (BLS) |
| URSA OPERATING COMPANY LLC, ) | |
| ) | |
| Debtor. ) | |
| ) | |
| THE ROYALTY CLAIMANTS, ) | |
| ) | C.A. No. 21-495 (MN) |
| Appellants, ) | |
| v. ) | |
| ) | |
| URSA OPERATING COMPANY LLC, ) | |
| ) | |
| Appellee. ) | |

## MEMORANDUM OPINION

Maria Aprile Sawczuk, GOLDSTEIN & MCCLINTOCK, LLP, Wilmington, DE; George A. Barton, Taylor P. Foye, BARTON AND BURROWS, LLC, Mission, KS – Attorneys for the Royalty Claimants.

Robert S. Brady, Edmon L. Morton, Kenneth J. Enos, Joseph M. Mulvihill, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, DE; Duston K. McFaul, Maegan Quejada, SIDLEY AUSTIN LLP, Houston, TX; David Kronenbergy, SIDLEY AUSTIN LLP, Washington, DC; Robert S. Velevis, SIDLEY AUSTIN LLP, Dallas, TX – Attorneys for the Wind-Down Debtor.

John H. Knight, Amanda R. Steele, David T. Queroli, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE; Ana Alfonso, Erin Ryan, WILKIE FARR & GALLAGHER LLP, New York, NY – Attorneys for Wells Fargo Bank, National Association, as Agent.

May 4, 2021
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE:**

Pending before the Court is the *Emergency Motion for Stay Pending Appeal* (D.I. 4)[1] ("the Emergency Stay Motion") filed by various appellants ("the Royalty Claimants") with respect to the Bankruptcy Court's March 30, 2021 *Order Regarding Certain Royalty Claimants and Sustaining the Debtors' First Omnibus Objection to Certain Proofs of Claim* ("the Order"). The Court has considered the opposition (D.I. 11) filed by Ursa Operating Company LLC ("the Wind-Down Debtor"); the response and joinder (D.I. 12) filed by Wells Fargo Bank, National Association ("Wells Fargo"), as administrative agent under a prepetition credit agreement; and the reply in further support of the Emergency Stay Motion filed by the Royalty Claimants. Also pending before the Court is the unopposed *Administrative Agent's Motion to Intervene* filed by Wells Fargo (D.I. 18) ("the Motion to Intervene"). For the reasons set forth herein, the Court will grant the Motion to Intervene and deny the Emergency Stay Motion.

## I. BACKGROUND

### A. The Debtors and the Royalty Claimants

On September 2, 2020 ("the Petition Date"), the Wind-Down Debtor and certain of its affiliates (collectively, "the Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Prior to selling all of their assets in the chapter 11 cases, the Debtors operated an oil and gas exploration and production company in Colorado. As part of their business model, the Debtors entered into many oil and gas leases with property owners. The leases provide those

---

[1] The docket of the Chapter 11 cases captioned *In re Ursa Piceance Holdings, et al.*, Case No. 20-12065 (BLS) (Bankr. D. Del.) is cited herein as "*Ursa Piceance* Bankr. D.I. __," and the docket of the Chapter 11 case captioned *In re Ursa Operating Company LLC*, Case No. 20-12067 (BLS) (Bankr. D. Del.) is cited herein as "*Ursa Operating* Bankr. D.I. __."

1

property owners with the right to receive royalties on account of proceeds from the sale of hydrocarbons from wells on their properties.

The underlying dispute arises based on the Royalty Claimants' allegations that the Debtors wrongfully deducted operating expenses from royalties due to the Royalty Claimants in the amount of approximately $24 million. The Debtors disputed that any deductions were wrongfully applied but rather were applied in accordance with the terms of the applicable lease or state law. The dispute between the parties began several years ago in state court in Colorado, and as of the time of the Debtors' bankruptcy filing, the Colorado litigation remained in its infancy. The issues initially raised in the Colorado state court were effectively put before the Bankruptcy Court as a core proceeding for consideration and disposition of the Royalty Claimants' claims.

### B. The Claim Objection

The Royalty Claimants filed multiple proofs of claim both before and after the bar date. The Royalty Claimants initially filed their claims as secured claims based upon the assertion that applicable state law gave them liens on proceeds received or held by the Debtors. On December 17, 2020, the Debtors filed their *First Omnibus (Substantive) Objection to the Classification of Claims Pursuant to Section 502 of the Bankruptcy Code, Bankruptcy Rule 3007, and Local Rule 3007* (*Ursa Piceance* Bankr. D.I. 331) ("the Claim Objection"). The Debtors objected to the classification of these claims as secured contending, first, that state law did not confer secured status on the claims, and second, that even if the Royalty Claimants held security interests, their liens would be unperfected and, therefore, behind hundreds of millions of dollars of unpaid senior secured claims in these cases. The Debtors therefore sought to reclassify the claims as general unsecured claims that would share pro rata under the Debtors' plan in distributions from a fund for unsecured claims in the amount of approximately $500,000.

2

The record reflects that the Royalty Claimants later abandoned their contention that they are secured creditors but subsequently contended that any royalty shortfalls owed to the Royalty Claimants are monies held in trust by the Debtors for the Royalty Claimants' benefit and are not property of the Debtors' estate. On December 31, 2020, the Royalty Claimants filed a response to the Claim Objection asserting this argument. (*Ursa Piceance*, Bankr. D.I. 337). On January 8, 2021, the Royalty Claimants began filing adversary proceedings asserting damages for breach of contract and seeking declaratory relief that the alleged underpaid royalties were not property of the estate.

On January 6, 2021, the Bankruptcy Court held the confirmation hearing and confirmed a plan of reorganization. (*Ursa Piceance* Bankr. D.I. 363). The order confirming the plan of reorganization was entered on January 8, 2021. (*Ursa Piceance* Bankr. D.I. 365).

On January 13, 2021, the Debtors filed a reply in support of their Claim Objection. The Debtors argued that the property of the estate issue was not properly brought before the Bankruptcy Court with respect to the Claim Objection and should instead be addressed through the adversary proceedings. The parties coordinated with each other to address this issue and to present it to the Bankruptcy Court for disposition, and the Bankruptcy Court held a status conference on January 19, 2021 to discuss a procedure for adjudication the parties' disputes. (*Ursa Piceance* Bankr. D.I. 425). The parties entered into a stipulation related to their disputes and amended such stipulation to reflect the rescheduling of certain hearings and deadlines (*Ursa Piceance* Bankr. D.I. 424, 466) (respectively, "the Stipulation" and "the Amended Stipulation"). Among other things, the parties agreed that, prior to adjudication of the merits of the Royalty Claimants' claims, they would ask the Bankruptcy Court to "consider whether the monies which the Royalty Claimants seek to recover on their royalty underpayment claims against Ursa constituted money

that is not property of the Wind-Down Debtors' estate" and "the amount of reserves, if any, that shall be maintained by the Wind-Down Debtors until the resolution of the Adversary Proceedings." (Stipulation ¶¶ 6-7). Under the agreed procedure, the Bankruptcy Court was not asked to determine whether any amounts were deducted by the Debtors in violation of leases or state law, nor was it asked to make a determination as to any amounts relating to specific claimants.

### B. The Bench Ruling and Order

On March 8, 2021, the Bankruptcy Court held a hearing solely on the issues agreed upon in the Stipulation. (*Ursa Piceance* Bankr. D.I. 480, 4/8/21 Hr'g Tr.). On March 11, 2021, the Honorable Brendan L. Shannon convened a hearing and issued a bench ruling (*Ursa Piceance* Bankr. D.I. 482, 3/11/21 Hr'g Tr.) ("the Bench Ruling"). Judge Shannon determined, *inter alia*, that Section 1-203 of the Colorado Uniform Commercial Code, which stands for the proposition that a lessor of goods retains a residual interest and title in the goods, did not support the Royalty Claimants' trust theory, as that section applies only to leases of goods and does not apply to underground oil and gas or to money. (*See id*. at 8:2-14). Judge Shannon further determined that while the "claims arise out of the contractual relationship by virtue of the many oil and gas leases that they entered into with the debtors" (*id*. at 7:22-24), the leases at issue did not demonstrate any retained ownership by the lessor or an expectation of a trust relationship with the lessee (*id*. at 8:15-18). *(See also id*. at 11:17-19 ("the contracts do not indicate or permit an inference that the debtor/lessee was holding funds or monies exclusively for the benefit of the lessors")). Judge Shannon further determined that the facts of the *SemCrude* case,[2] relied upon by the Royalty Claimants for the proposition that that oil sale proceeds are held in trust for royalty owners, were not analogous to the facts of the case before it. (*Id*. at 9:10-10:1). Having resolved those issues,

---

[2] *In re SemCrude, L.P.*, 418 B.R. 98 (Bankr. D. Del. 2009).

4

the Bankruptcy Court turned to the constructive trust argument, in which the Royalty Claimants sought imposition of a constructive trust, "a court imposed remedy for wrongful conduct and to prevent unjust enrichment" which is "not favored in bankruptcy." (*Id*. at 11:5-9). Judge Shannon noted:

> As a threshold matter, given that the parties' respective rights arise from the formal contractual relationship it is difficult to perceive, as a matter of law, how a constructive trust would or should be imposed here, given that if Ursa failed to make payments it was obligated to make under the lease the remedy would appear to lie not in equity, but at law in action for breach of contract.

(*Id*. at 11:10-16). Finally, Judge Shannon addressed the Royalty Claimants' misplaced reliance on a ruling made in the *Extraction Oil & Gas*[3] case. (*Id*. at 12:10-12). Having determined that the Royalty Claimants are holders of general unsecured claims and are not beneficiaries of a constructive trust, the Bankruptcy Court sustained the Debtors' Claim Objection. On March 30, 2021, the Bankruptcy Court entered the Order on appeal reclassifying the Royalty Claimants' claims as general unsecured claims.

### C. The Appeal

On April 2, 2021, the Royalty Claimants appealed the Order. (D.I. 1). The Royalty Claimants also filed their *Emergency Motion for Stay Pending Appeal* in the Bankruptcy Court (*Ursa Operating* Bankr. D.I. 22) ("the Bankruptcy Motion for Stay"). On April 12, 2021, the Wind-Down Debtor and Wells Fargo each filed a response (*Ursa Operating* Bankr. D.I. 32 & 33, respectively), and on April 13, 2021, the Bankruptcy Court held a hearing. At the hearing, the Bankruptcy Court held that the Royalty Claimants did not meet their burden for the imposition of a stay. (*Ursa Operating* Bankr. D.I. 36, 4/13/21 Hr'g Tr.). The following day, the Bankruptcy

---

[3] The docket of *In re Extraction Oil & Gas, Inc., et al.*, No. 20-11548 (CSS) (Bankr. D. Del.) is cited herein as "*Extraction* Bankr. D.I. __."

5

Court issued an order denying the Bankruptcy Motion for Stay but included a 21-day stay of the Order. (*Ursa Operating* Bankr. D.I. 37). The Bankruptcy Court made clear that the additional stay was "a courtesy to the District Court, to avoid what I expect would be an emergency proceeding this afternoon or within the next day or few days." (4/13/21 Hr'g Tr. at 33:3-6). "[B]ut so that the record is clear, while I am entering a stay for the reasons that I've shared, I am not satisfied that the movants have carried their burden under the Revel standard." (*Id*. at 33:9-12). Specifically, after conducting "an extensive hearing" (*id*. at 33:15), Judge Shannon noted, "my ruling was abundantly clear that I did not find that there was any predicate that was demonstrated for the relief that was ultimately sought, which was, effectively a trust or a constructive trust" (*id.* at 33:16-19). Judge Shannon made detailed rulings that "no case law existing under Colorado law or otherwise that would have supported the relief that was being sought" (*id*. at 34:2-4) and also determining that the *Extraction Oil & Gas* ruling relied on by the Royalty Claimants was "not binding" and "doesn't stand for any proposition that unpaid royalties are not property of a debtors' estate" (*id*. at 33-34).

On April 16, 2021, the Royalty Claimants filed the Emergency Stay Motion in this Court. The Emergency Stay Motion is fully briefed. (D.I. 4, 11, 12, 15). The Court did not hear oral argument because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument.

## II. <u>JURISDICTION AND STANDARD OF REVIEW</u>

The Order classifying the Royalty Claimants' claims as general unsecured claims is a final order, and the Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a). On appeal, district courts "review the bankruptcy court's legal determinations *de novo*, its factual findings for clear error and its exercise of discretion for abuse thereof." *In re Trans World Airlines, Inc.*,

6

145 F.3d 124, 131 (3d Cir. 1998). The Bankruptcy Court's application of facts to a controlling legal standard will be reviewed on appeal for clear error. *See Pa. Higher Educ. Assistance Agency v. Gillins*, 2003 WL 22844398, at *1 (D. Del. Nov. 24, 2003) (reviewing lower court's application of facts to controlling legal test for clear error); *In re Paige*, 2008 WL 1994905, at *2 (D. Utah May 8, 2008) (determination was factual where there was "no real issue as to the controlling law" but only to the court's application of that legal standard to facts).

## III. ANALYSIS

"The granting of a motion for stay pending appeal is discretionary with the court." *In re Trans World Airlines, Inc.*, 2001 WL 1820325, at *2-3 (Bankr. D. Del. Mar. 27, 2001). A stay pending appeal is an "extraordinary remedy." *In re W.R. Grace & Co.*, 475 B.R. 34, 205 (D. Del. 2012) (quoting *United States v. Cianfrani*, 573 F.2d 835, 846 (3d Cir. 1978)). The movant bears the burden of establishing that imposition of a stay is warranted. In determining whether the moving party met its burden, courts in the Third Circuit consider the following factors:

> (1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether the issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015) (citing *Hilton v. Braunskill,* 481 U.S. 770, 776 (1987)). "'[T]he most critical' factors, according to the Supreme Court, are the first two: whether the stay movant has demonstrated (1) a strong showing of the likelihood of success and (2) that it will suffer irreparable harm." *Id*. (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)). Because all four factors are interconnected, the Third Circuit has instructed that the analysis should proceed as follows:

> Did the applicant make a sufficient showing that (a) it can win on the merits (significantly better than negligible but not greater than

>               50%) ***and*** (b) will suffer irreparable harm absent a stay? If it has,
>               we balance the relative harms considering all four factors using a
>               'sliding scale' approach. However, if the movant does not make the
>               requisite showings on either of these first two factors, the inquiry
>               into the balance of harms and the public interest is unnecessary, and
>               the stay should be denied without further analysis.

*Id*. at 571 (internal quotations and citation omitted) (emphasis in original).

> A. **Likelihood of Success on the Merits**

The Royalty Claimants assert that they are likely to succeed on the merits of their appeal of the Order but place substantial weight on statements made by the Bankruptcy Court in the *Extraction Oil & Gas* case in the context of a plan confirmation hearing. (*See* D.I. 4 at 7-10). In that case, debtor Extraction argued that the royalty owners' claims for royalty underpayments should be treated as general unsecured creditor claims, as stated in its revised fifth amended joint plan of reorganization. (*Extraction* Bankr. D.I. 1475, Art. IV, Para. F, subparagraph 11: proposing that "any right to payment . . . arising from a Royalty Interest . . ., if any, shall be treated as a General Unsecured Claim under the Plan and shall be treated in accordance therewith . . ."). The royalty owners objected. The Bankruptcy Court sustained the royalty owners' objection, stating "if you have a disputed royalty claim that is ultimately decided to be due, then it was never a royalty claim. It becomes, I think correctly, as Mr. Barton said, you become the beneficiary of a resulting trust where the debtor is the resulting trustee, the corpus of the trust is the royalty payment, and the beneficiary is the royalty owner." (D.I. 15 at Ex. 2, 12/23/20 Hr'g Tr. at 87-89). In other words, the Royalty Claimants argue, although disputed royalty payments may be deemed property of the estate, that determination would change if there were an adjudication in favor of the Royalty Claimants and the disputed royalty payments become due. (D.I. 4 at 8). The Royalty Claimants assert that, if that were to happen, then under the *Extraction* ruling they would become the beneficiary of a "resulting trust" where the Wind-Down Debtor is the resulting trustee, and the

corpus of the trust is the withheld royalty payment. (*Id*.). According to the Royalty Claimants, the Wind-Down Debtor "fails to cite to any Colorado appellate decision which precludes the Royalty Claimants' claim for the imposition of a constructive trust with respect to the portion of the natural gas sale proceeds which is in the possession of Ursa, but actually is owned by the Royalty Claimants." (D.I. 15 at 2). Conversely, the Wind-Down Debtor argues reliance on the plan objection ruling in the *Extraction* case is misplaced. (D.I. 11 at 9).

The Court agrees with the Bankruptcy Court's well considered determination that the *Extraction* case is not binding and also "does not stand for the proposition that unpaid or underpaid royalties are funds that are not property of the debtor's estate." (Bench Ruling at 12:10-12). In *Extraction*, the relevant royalty holders objected to plan language deeming them general unsecured creditors before the issue had ever been litigated or otherwise determined. (*Extraction* Bankr. D.I. 1534, Hr'g Tr. at 35:21-36:2). The Bankruptcy Court in that case agreed with the royalty holders' position that it would be premature to classify them in the plan as general unsecured creditors before determining the merit of their allegations. (*Id.* at 87:10-88:24). The royalty holders did not seek to prove that they had a fiduciary or trust relationship with the Extraction debtors, however, and the Bankruptcy Court in *Extraction* did not rule on, or otherwise consider, whether the property was actually property of the estate or not. (*Id*.). Rather, the *Extraction* court merely confirmed the plan after a consensual resolution was reached by the parties that reserved the full amount of the disputed royalties pending a hearing on the issue. It is clear from the transcript of that hearing that the Bankruptcy Court in *Extraction* was resolving a plan objection and nothing more. (*See id*. at 35:21-23, 87:10-88:24). Thus, the Royalty Claimants' reliance on the *Extraction* does not demonstrate "a significantly better than negligible" chance of success on the merits of their appeal.

Nor do their remaining arguments satisfy this burden. The Royalty Claimants argue that a stay pending appeal is necessary because the adversary proceedings have not been fully adjudicated. (*See* D.I. 4 at 8-9). According to the Wind-Down Debtor, the mere fact that the Royalty Claimants filed a cogent adversary complaint and the parties agreed to bifurcate the issues for consideration does not warrant a stay pending appeal. The Court agrees. In the Stipulation, the parties agreed that the relevant threshold issue to bring to the Bankruptcy Court was solely on the property of the estate argument and, if the Royalty Claimants were entitled to equitable relief, the corresponding amount of reserve that should be held while the claim amount is fully adjudicated. (*See* Stipulation ¶¶ 6-7). That the Royalty Claimants failed to demonstrate an entitlement to equitable relief does not warrant a stay.

The Royalty Claimants further argue that the Debtors are bound by their stipulated agreement that the Debtors breached legal obligations under their leases, engaged in wrongful conduct, or unjustly enriched themselves. (D.I. 15 at 8). According to the Royalty Claimants, "[t]he stipulation further shows that the Royalty Claimants have made a strong showing of their likelihood of success on the merits of this appeal." (*Id.*). The Court disagrees. What the Debtors agreed to stipulate for purposes of the property of the estate determination was summarized by the Bankruptcy Court: "For the purposes of this hearing only the debtors will stipulate that deductions were taken, that they were wrongful, and that they could accumulate to an amount of approximately $24 million." (Bench Ruling at 7:4-7). The issues related to an alleged breach of contract are irrelevant to the question of whether there should be a stay pending appeal of the property of the estate ruling. Even with these assumptions made solely for the purpose of the hearing, the Bankruptcy Court found that the Royalty Claimants cannot justify the imposition of a constructive trust or the establishment of a reserve. (*Id*. at 12:22-13:1).

The Royalty Claimants appear to conflate their potential for success on the underlying royalty underpayment dispute with their potential for success on the property of the estate issue. Even if they can establish an underlying breach of contract claim – an issue that will be resolved through the claims resolution process – the Royalty Claimants have always had the burden to show that the estate was holding their property. Central to the Emergency Stay Motion is whether the Royalty Claimants can make a strong showing of a likelihood of success on the property of the estate issue, but they have not made a strong showing that any trust exists or should have been imposed. It is undisputed that no express trust exists. In order to establish a constructive trust, the Royalty Claimants would need to prove a trust or fiduciary/confidential relationship based on the permissive factors courts apply to distinguish such a relationship from a debtor-creditor relationship: (1) intent to create a trust; (2) absence of interest payments; (3) segregation of trust funds; and (4) whether the debtor played the role of a "mere conduit" or "receiving and transmitting agent" for trust funds compared to a vendor-purchaser relationship.[4] "[P]arties seeking to prove a trust relationship typically bear a very heavy burden of proof under both state and federal law." *In re SemCrude, L.P.*, 418 B.R. 98, 106 n.5 (Bankr. D. Del. 2009).

The Royalty Claimants argue that Colorado law supports the creation of a resulting trust, that appellees have failed to cite any contrary state law, and that they are likely to succeed on appeal of this issue. This argument misses the point. Finding no predicate for the relief sought – a trust or a constructive trust – Judge Shannon noted:

> it was difficult for me to perceive how [such relief] might be available as a matter under contract law. And we can debate whether or not Colorado law does or does not permit the imposition of a constructive trust. ***But that was not the predicate or the exclusive***

---

[4] *See, e.g., In re Columbia Gas Sys. Inc.*, 997 F.2d 1039, 1054-55 (3d Cir. 1993) (applying factors); *In re Amp'd Mobile, Inc.*, 377 B.R. 478, 482-85 (Bankr. D. Del. 2007) (same); *In re Edison Bros., Inc.*, 234 B.R. 231, 237-38 (Bankr. D. Del. 2000) (same).

11

> ***basis for my ruling***. I went through the arguments and the case law that had been identified by the parties. I found that there was no case law existing under Colorado law or otherwise that would have supported the relief that was being sought.

(4/13/21 Hr'g Tr. at 33:16-34:4). In support of their argument that constructive trusts have been imposed "to prevent the unjust enrichment that would result if the person in possession of the property was permitted to retain it" (D.I. 4 at 32), the Royalty Claimants cite *Ralston Oil & Gas Co. v. July Corp*, 719 P.2d 334 (Colo. App. 1985); *Page v. Clark*, 592 P.2d 792 (Colo. 1979); *Mancuso v. United Bank of Pueblo*, 818 P.2d 732 (Colo. 1991); and *Yetter Well Service, Inc. v. Cimarron Oil Co.*, 841 P.2d 1068 (Colo. App. 1992). As the Wind-Down Debtor correctly points out, however, these cases are distinguishable by facts or circumstances that are not present here. *Ralston* involved a business deal gone wrong between two former friends and neighbors. *See Ralston*, 719 P.2d at 338. There, the court discussed imposing a constructive trust when a confidential relationship between two parties is abused. (*Id*. ("Thus, a transfer of property obtained as a result of an abuse of a confidential relationship between two parties may be set aside, and the court may remedy such abuse by imposing a constructive trust")). Similarly, in *Page*, the court and "the parties . . . focused on whether there was a confidential relationship." *Page*, 592 P.2d at 798. In *Mancuso*, the court held summary judgment to be improperly granted against the imposition of a constructive trust under the alternate theories of (i) abuse of a confidential relationship and (ii) a party's knowledge of a preexisting trust relationship with a third party. *Mancuso*, 818 P.2d at 737. In *Yetter*, the court cited the *Mancuso* case with limited discussion in the context of distinguishable facts. *Yetter*, 841 P.2d at 1070-71 (imposing constructive trust as a remedy under state fraudulent conveyance statute). Here, no confidential relationship exists or was abused. Further, no claim has been made that the Wind-Down Debtor took the monies at issue with knowledge of a preexisting trust relationship between a third party and the Royalty Claimants.

Simply put, none of the cited decisions were made in the context of a simple contractual dispute between parties in an arms-length contractual relationship about the payment terms of the relevant contract. These cases do not support the Royalty Claimants' likelihood of success on appeal.

### B. Irreparable Harm In Absence of a Stay

Whether a moving party has established irreparable harm is the second of the two "most critical factors" in determining whether the moving party carried its burden to obtain a stay pending appeal. *Revel AC*, 802 F.3d at 571. Irreparable harm "refer[s] to 'harm that cannot be prevented or fully rectified' by a successful appeal.'" *Id.* at 568 (quoting *Roland Mach. Co. v. Dresser Indus.*, 749 F.2d 380, 386 (7th Cir. 1984)). Moreover, the movant must "demonstrate that irreparable injury is likely [not merely possible] in the absence of [a] [stay]." *Id.* at 569 (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). The Third Circuit has held that pure economic injury does not satisfy the irreparable injury requirement. *Minard Run Oil Co. v. Forest Service*, 670 F.3d 236, 255 (3d Cir. 2011). An exception exists for when the loss can lead to the end of a movant's business, but that exception does not apply here.

The Royalty Claimants argue that, in absence of a further stay of the Order, and holding the underpaid royalties in reserve, they may suffer irreparable harm in the event they prevail in the adversary proceedings. "Once the Claims Objection Order becomes effective, . . . the Wind-Down Debtor will likely disperse the money it holds to Wells – money that may ultimately be owed to the Royalty Claimants." (D.I. 4 at 11). In that event, the Royalty Claimants assert, "individual property owners who entered into honest business transactions with the Debtors . . . are set to be forever damaged if and when the Debtors no longer have sufficient funds to satisfy any amounts that may be found to be due to the Royalty Claimants." (*Id.*). "If the stay is denied, and the

Royalty Claimants thereafter prevail, the monies will have already been distributed to the Lenders, against whom the Royalty Claimants then will have to pursue additional litigation." (D.I. 15 at 9).

The Wind-Down Debtor argues that the potential harm alleged here is purely economic and therefore does not satisfy the standard under Third Circuit law. Moreover, the Bankruptcy Court has already determined that the Royalty Claimants' allegations do not justify the establishment of a reserve for their benefit (Bench Ruling at 12:22-13:1), yet the Emergency Stay Motion seeks to impose a "de facto reserve" by "preventing the administration of the Wind-Down Debtor's confirmed and effective plan." (D.I. 11 at 17). Such relief should not be granted, but in the event that a stay is imposed by this Court, the Wind-Down Debtor asserts, the Royalty Claimants must be required to post a bond. Such a stay, it contends, "would delay distributions resulting in harm to the Wind-Down Debtor's creditors, including the [l]enders, in the form of lost opportunity costs from delay in reinvesting the distributable cash as well as increased costs and expenses relating to the administration of the Wind-Down Debtor's estate." (*Id*. at 20-21). "Because there is clearly harm to non-movants, the Royalty Claimants' assertion that no bond is required is incorrect." (*Id*. at 21).

In the Court's view, the harm identified by the Royalty Claimants is not one that cannot be prevented or fully rectified by a successful appeal. The Royalty Claimants cite *South Camden Citizens in Action* for the position that economic injury can satisfy the irreparable injury factor when "a money judgment cannot compensate for [the] economic injury." *South Camden Citizens in Action*, 2001 WL 34131402, at *1 (citing *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 205 (3d Cir. 1990)). The Royalty Claimants argue that once "the monies are disbursed they are likely lost forever." (D.I. 4 at 12). Although the Royalty Claimants acknowledge that irreparable harm "is not found . . . when there is the 'availability of adequate monetary damages'

at a later date" (D.I. 4 at 12), they offer no legal reason why they could not seek to pursue the lenders for any amounts that may later be found to have been wrongfully distributed. *Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 102 (3d 1988). The Royalty Claimants' losses, if any, would be purely economic, and the Court agrees with the Bankruptcy Court's determination that Royalty Claimants have failed to establish irreparable harm. (4/13/21 Hr'g Tr. at 35:3-12 ("I'm not satisfied that . . . the failure to stay [the] process [of paying senior secured creditors whose liens were established and not subject to challenge, such payment coming from the proceeds of their collateral] pending appeal would give rise to irreparable harm.")).

## IV. CONCLUSION

The Royalty Claimants have failed to carry their burden on the two most critical factors — likelihood of success on the merits and irreparable harm. Accordingly, no further analysis is required, and the Court will deny the Emergency Stay Motion. *See Revel AC*, 802 F.3d at 571. An appropriate order follows.