IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE: ) | Chapter 11 |
| ) | Case No. 20-12067 (BLS) |
| URSA OPERATING COMPANY LLC, ) | |
| ) | |
| Debtor. ) | |
| ) | |
| THE ROYALTY CLAIMANTS, ) | |
| ) | C.A. No. 21-495 (MN) |
| Appellants, ) | |
| v. ) | |
| ) | |
| URSA OPERATING COMPANY LLC, ) | |
| ) | |
| Appellee. ) | |

**MEMORANDUM OPINION**

Maria Aprile Sawczuk, GOLDSTEIN & MCCLINTOCK, LLP, Wilmington, DE; George A. Barton, Taylor P. Foye, BARTON AND BURROWS, LLC, Mission, KS – Attorneys for the Royalty Claimants.

Robert S. Brady, Edmon L. Morton, Kenneth J. Enos, Joseph M. Mulvihill, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, DE; Duston K. McFaul, Maegan Quejada, SIDLEY AUSTIN LLP, Houston, TX; David Kronenbergy, SIDLEY AUSTIN LLP, Washington, DC; Robert S. Velevis, SIDLEY AUSTIN LLP, Dallas, TX – Attorneys for the Wind-Down Debtor.

John H. Knight, Amanda R. Steele, David T. Queroli, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE; Ana Alfonso, Erin Ryan, WILKIE FARR & GALLAGHER LLP, New York, NY – Attorneys for Intervenor, Wells Fargo Bank, National Association, as Agent.

March 30, 2022
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE:**

Pending before the Court is an appeal filed by various royalty claimants ("the Royalty Claimants") with respect to the Bankruptcy Court's *Order Regarding Certain Royalty Claimants and Sustaining the Debtors' First Omnibus Objection to Certain Proofs of Claim,* dated March 30, 2021 (*Ursa Piceance* Bankr. D.I. 18)[1] ("the Order"), entered in the chapter 11 cases of Ursa Piceance Operating Company LLC and certain of its affiliates, including Ursa Piceance Holdings LLC ("Ursa Holdings"), Ursa Piceance LLC, and Ursa Piceance Pipeline LLC (collectively, "the Debtors").  The Order sustained the objection of appellee ("the Wind-Down Debtor") to the Royalty Claimants' claims and reclassified those claims as general unsecured claims for purposes of their treatment under the Debtors' confirmed plan of reorganization.  For the reasons set forth herein, the Court will affirm the Order.

**I.     BACKGROUND**

   **A.     The Debtors**

In 2012, Debtors were formed to operate oil and natural gas properties primarily located in the Piceance Basin, Colorado, acquired from Antero Resources Piceance LLC and Antero Resources Pipeline LLC (together, "Antero").  (*Ursa Piceance* Bankr. D.I. 2).  In December 2012, Ursa Holdings, as borrower, certain other Debtors, as guarantors, Wells Fargo Bank, National Association, as administrative agent ("Prepetition RBL Agent"), and certain lenders ("Prepetition RBL Lenders") entered into a Credit Agreement, dated December 21, 2012 ("Prepetition RBL Credit Facility").  (*Id*. ¶ 22).  Debtors' obligations under the Prepetition RBL Credit Facility

---

[1] The docket of the Chapter 11 cases captioned *In re Ursa Piceance Holdings, et al.*, Case No. 20-12065 (BLS) (Bankr. D. Del.) is cited herein as "*Ursa Piceance* Bankr. D.I. __," and the docket of the Chapter 11 case captioned *In re Ursa Operating Company LLC*, Case No. 20-12067 (BLS) (Bankr. D. Del.) is cited herein as "*Ursa Operating* Bankr. D.I. __."

("Prepetition RBL Obligations") were secured by substantially all of the Debtors' assets. (*Id*.). On the Petition Date, Debtors owed an aggregate principal amount of approximately $209 million on account of the Prepetition RBL Credit Facility. (*Id*. ¶ 23).

In 2018, as natural gas prices declined, Debtors encountered liquidity issues. (*Id*. ¶ 35). In December 2018, Debtors retained various professionals to explore options available to address their liquidity issues, including potential sale of the business, financing transactions, and loan restructuring. In July 2020, Debtors made the decision to pursue a sale process with the aim of consummating an asset sale under section 363 of the Bankruptcy Code. (*Id*. ¶ 38).

B.  **The Chapter 11 Cases**

On September 2, 2020 ("the Petition Date"), Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On the Petition Date, the Debtors had $2,281,352.97 in a bank account where they received their primary revenues ("the Revenue Account"). (*Ursa Piceance* Bankr. D.I. 439) ("Suppl. Chronister Decl."). This amount represented all of the funds held by the Debtors on the Petition Date. (*Id*. ¶ 8). The total funds held by all the Debtors on the Petition Date was $2,688,810.00, and all funds were pledged as security for the Prepetition RBL Obligations. (*Id*.). The Bankruptcy Court authorized the Debtors to enter into a debtor-in-possession ("DIP") financing facility (*Ursa Piceance* Bankr. D.I. 123) ("the Final DIP Order"). The DIP facility was secured by first-priority liens on all of the Debtors' assets, including all cash, and Debtors' obligations under the Final DIP Order were allowed superpriority claims. (*Id*. ¶¶ 2(j), (k), (m), (n)).

On September 29, 2020, the Bankruptcy Court approved bidding procedures to govern a sale process for all or substantially all of the Debtors' assets. (*Ursa Piceance* Bankr. D.I. 124). The sale process resulted in the selection of a bid by third-party Terra Energy Partners LLC

2

("Terra") in the amount of $60 million, as the baseline bid for an auction approved at the direction of the Bankruptcy Court. Other bidders declined to top Terra's baseline bid at the auction, and Terra's $60 million bid was determined to be the highest and best offer. (*Id*. at Bankr. D.I. 230). The sale closed on December 22, 2020. (*Id*., Bankr. D.I. 332). In connection with the sale, the Debtors received $47,095,235.78 ("the Sale Proceeds"). (Suppl. Chronister Decl. ¶ 13). Those proceeds were deposited into the Revenue Account, which held $5,205,252.83 prior to the deposit of the proceeds. (*Id*.). These amounts were materially insufficient to fully repay the over $259 million owed to the Prepetition RBL Lenders.

    **C.**    **The Royalty Claimants**

As part of their business model, Debtors entered into many oil and gas leases with property owners. The leases provide those property owners with the right to receive royalties on account of proceeds from the sale of hydrocarbons from wells on their properties. The underlying dispute arises from the Royalty Claimants' allegations that Antero and the Debtors wrongfully deducted operating expenses from royalties owed to the Royalty Claimants in the amount of approximately $24 million. Debtors disputed that any deductions they may have applied were wrongfully withheld but rather were applied in accordance with the terms of the applicable lease or state law. Beginning in 2016, certain of the Royalty Claimants filed both individual lawsuits and class actions in Colorado state court asserted royalty underpayments. As of the Petition Date, the Colorado litigation remained in its infancy. The issues initially raised in the Colorado state court were effectively put before the Bankruptcy Court as a core proceeding for consideration and disposition of the Royalty Claimants' claims.

On October 26, 2020, the Bankruptcy Court entered an order setting the deadline for all creditors, except governmental entities, to file proofs of claims ("the Bar Date"). (*Ursa Piceance*

Bankr. D.I. 188). The Royalty Claimants filed multiple proofs of claim both before and after the Bar Date. The record reflects that the Royalty Claimants initially filed their claims as secured claims based on the assertion that applicable state law gave them liens on proceeds received or held by the Debtors. On December 17, 2020, the Debtors filed their *First (1st) Omnibus (Substantive) Objection to the Classification of Claims Pursuant to Section 502 of the Bankruptcy Code, Bankruptcy Rule 3007, and Local Rule 3007-1* ("the Claim Objection"), seeking, among other things, reclassification of the claims filed by the Royalty Claimants. (*Id.*, Bankr. D.I. 331).

The Debtors objected to the classification of these claims as secured contending, first, that state law did not confer secured status on the claims, and second, that even if the Royalty Claimants held security interests, their liens would be unperfected and, therefore, fall behind hundreds of millions of dollars of unpaid senior secured claims. The Debtors sought to reclassify the claims as general unsecured claims that would share pro rata under the Debtors' plan in distributions from a fund for unsecured claims in the amount of approximately $500,000. The Royalty Claimants subsequently abandoned their contention that they are secured creditors, but filed a response to the Claim Objection on December 31, 2020, arguing that any royalty shortfalls owed to the Royalty Claimants are monies held in trust by the Debtors for the Royalty Claimants' benefit and are not property of the Debtors' estate. (*Id.*, Bankr. D.I. 337).

On January 6, 2021, the Bankruptcy Court confirmed the Wind-Down Debtors' plan of reorganization. (*Id.*, Bankr. D.I. 363). The order confirming the plan was entered on January 8, 2021. (*Id.*, Bankr. D.I. 365).

D.   **Property of the Estate Litigation**

Starting on January 8, 2021, the Royalty Claimants filed various adversary proceedings ("the Adversary Proceedings") asserting damages for breach of contract and asking for declaratory

relief that cash in possession of the Wind-Down Debtor was not property of the estate.[2] (*Id.*, Bankr. D.I. 18-2 (listing adversary proceedings filed by the Royalty Claimants)). On January 13, 2021, the Wind-Down Debtor filed a reply in support of their Claim Objection, arguing that the property of the estate issue was not properly brought before the Bankruptcy Court with respect to the Claim Objection and should instead be addressed through the Adversary Proceedings. The Bankruptcy Court held a status conference on January 19, 2021 to discuss a procedure for adjudication of the parties' disputes. (*Id.*, Bankr. D.I. 425). The parties entered into a stipulation related to their disputes and later amended such stipulation to reflect the rescheduling of hearings and deadlines (*id.* Bankr. D.I. 424, 466) (respectively, "the Stipulation" and "the Amended Stipulation"). Among other things, the parties agreed that, prior to adjudication of the merits of the Royalty Claimants' claims, they would ask the Bankruptcy Court to "consider whether the monies which the Royalty Claimants seek to recover on their royalty underpayment claims against Ursa constituted money that is not property of the Wind-Down Debtors' estate" and "the amount of reserves, if any, that shall be maintained by the Wind-Down Debtors until the resolution of the Adversary Proceedings." (Stipulation ¶¶ 6-7). Under the agreed procedure, the Bankruptcy Court was not asked to determine whether any amounts were deducted by the Debtors in violation of leases or state law, nor was it asked to make a determination as to any amounts relating to specific claimants.

The parties also agreed that declarations could be filed prior to the hearing on such issues. (*Id.* ¶ 6). The Wind-Down Debtor filed the *Supplemental Declaration of Jamie Chronister in Support of Wind-Down Debtors' Reply in Support of First (1st) Omnibus (Substantive) Objection*

---

[2] *Ursa Piceance* Bankr. D.I. 367, 381, 382, 383, 384, 385, 386, 387, 388, 389, 390, 391, 392, 393, 394, 394, 396, 397, 428 (complaints initiating adversary proceedings).

*to Claims Pursuant to Section 502 of the Bankruptcy Code, Bankruptcy Rule 3007, and Local Rule 3007-1*. (*Ursa Piceance* Bankr. D.I. 439). The Royalty Claimants filed the *Declaration of Donald Phend in Support of the Royalty Owners' Response in Opposition to Ursa Operating Company, LLC's First Omnibus (Substantive) Objection to the Classification of Claims Pursuant to Section 502 of the Bankruptcy Code, Bankruptcy Rule 3007, and Local Rule 3007-1*. (*Id.*, Bankr. D.I. 443). The Prepetition RBL Agent also filed its *Objection to Certain Relief Requested by Royalty Claimants Against Collateral in the Wind-Down Debtors' Possession* on behalf of the Prepetition RBL Lenders. (*Id*., Bankr. D.I. 438).

### E. The Bench Ruling and Order

On March 8, 2021, the Bankruptcy Court held a hearing solely on the issues agreed upon in the Stipulation. (*Ursa Piceance* Bankr. D.I. 480 ("3/8/21 Tr.")). On March 11, 2021, the Honorable Brendan L. Shannon convened a hearing and issued a bench ruling, holding that the Royalty Claimants are holders of general unsecured claims and are not beneficiaries of a trust, and rejecting the Royalty Claimants' arguments that the Wind-Down Debtor holds funds that are not property of the estate. (*Id.,* Bankr. D.I. 482 ("3/11/21 Tr.")).

Judge Shannon determined, *inter alia*, that Section 1-203 of the Colorado Uniform Commercial Code, which stands for the proposition that a lessor of goods retains a residual interest and title in the goods, did not support the Royalty Claimants' trust theory, as that section applies only to leases of goods and does not apply to underground oil and gas or to money. (*See id*. at 8:2-14). Judge Shannon further determined that although the "claims arise out of the contractual relationship by virtue of the many oil and gas leases that they entered into with the debtors" (*id*. at 7:22-24), the leases at issue did not demonstrate any retained ownership by the lessor or an expectation of a trust relationship with the lessee. (*Id*. at 8:15-18; *see id*. at 11:17-19 ("the contracts

6

do not indicate or permit an inference that the debtor/lessee was holding funds or monies exclusively for the benefit of the lessors")). Judge Shannon further determined that the facts of the *SemCrude* case,[3] relied upon by the Royalty Claimants for the proposition that that oil sale proceeds are held in trust for royalty owners, were not analogous to the facts of the case before it. (*Id*. at 9:10-10:1). Having resolved those issues, the Bankruptcy Court turned to the constructive trust argument, in which the Royalty Claimants sought imposition of a constructive trust, "a court imposed remedy for wrongful conduct and to prevent unjust enrichment" which is "not favored in bankruptcy." (*Id*. at 11:5-9). Judge Shannon noted:

> As a threshold matter, given that the parties respective rights arise from the formal contractual relationship it is difficult to perceive, as a matter of law, how a constructive trust would or should be imposed here, given that if Ursa failed to make payments it was obligated to make under the lease the remedy would appear to lie not in equity, but at law in action for breach of contract.

(*Id*. at 11:10-16). Finally, Judge Shannon addressed the Royalty Claimants' misplaced reliance on a ruling made in the *Extraction Oil & Gas*[4] case. (*Id*. at 12:10-12). Having determined that the Royalty Claimants are holders of general unsecured claims and are not beneficiaries of a constructive trust, the Bankruptcy Court sustained the Debtors' Claim Objection. The Bankruptcy Court entered the Order on March 30, 2021, which stayed any rights derived from the Order for 14 days. (*Ursa Piceance* Bankr. D.I. 18).

F. **The Appeal and Stay Motions**

On April 2, 2021, the Royalty Claimants filed their appeal of the Order and also filed their *Emergency Motion for Stay Pending Appeal* in the Bankruptcy Court (*Ursa Operating* Bankr.

---

[3]   *In re SemCrude, L.P.*, 418 B.R. 98 (Bankr. D. Del. 2009).

[4]   *In re Extraction Oil & Gas, Inc., et al.*, No. 20-11548 (CSS) (Bankr. D. Del.)

D.I. 22) ("the Bankruptcy Motion for Stay"). On April 13, 2021, the Bankruptcy Court held a hearing on the Bankruptcy Motion for Stay. At the hearing, the Bankruptcy Court held that the Royalty Claimants did not meet their burden for the imposition of a stay. (*Id.,* Bankr. D.I. 36 ("4/13/21 Tr."). Finding no predicate for the relief sought – a trust or a constructive trust – Judge Shannon noted:

> it was difficult for me to perceive how [such relief] might be available as a matter under contract law. And we can debate whether or not Colorado law does or does not permit the imposition of a constructive trust. ***But that was not the predicate or the exclusive basis for my ruling***. I went through the arguments and the case law that had been identified by the parties. I found that there was no case law existing under Colorado law or otherwise that would have supported the relief that was being sought.

(*Id.* at 33:16-34:4) (emphasis added). The following day, the Bankruptcy Court issued an order denying the Bankruptcy Motion for Stay but including a 21-day stay of the Order. (*Id.,* Bankr. D.I. 37). On April 16, 2021, the Royalty Claimants also filed a motion for stay pending appeal in this Court. On May 4, 2021, the Court issued a Memorandum Opinion denying the motion for stay pending appeal and permitting Wells Fargo Bank, National Association, as Agent for the RBL Lenders, to intervene in the appeal. (D.I. 21).

The merits of the appeal are fully briefed. (D.I. 27, 28, 29, 31, 32). The Court did not hear oral argument because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument.

## II.  JURISDICTION AND STANDARD OF REVIEW

The Order classifying the Royalty Claimants' claims as general unsecured claims is a final order, and the Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a). On appeal, district courts "review the bankruptcy court's legal determinations *de novo*, its factual findings for clear error and its exercise of discretion for abuse thereof." *In re Trans World Airlines, Inc.*,

8

145 F.3d 124, 131 (3d Cir. 1998). This Court reviews *de novo* the Bankruptcy Court's legal determination as to whether any underpaid royalties constitute property of the Debtors' bankruptcy estate, and that there is no legal basis for the imposition of a constructive trust. *Goody's Family Clothing v. Mountaineer Prop. Co. II, LLC*, 401 B.R. 656, 661 (D. Del. 2009) (holding that where an appeal only presents questions of law, the District Court is to exercise *de novo* review of the Bankruptcy Court's rulings), aff'd *sub nom.*, *In re Goody's Family Clothing, Inc.*, 610 F.3d 812 (3d Cir. 2010).

### III.   ANALYSIS

#### A.   Property of the Estate

Following Debtors' sale of substantially all of their assets, all of which were encumbered by the Prepetition RBL Lenders' liens and security interests, the only assets remaining in the Wind-Down Debtor's estate was the cash proceeds of the Prepetition RBL Lenders' collateral. Pursuant to the Wind-Down Debtors' confirmed plan, these cash proceeds were to be distributed to the Prepetition RBL Secured Parties. These proceeds, which were a fraction of the outstanding Prepetition RBL Obligations, were the only available source of recovery for the Prepetition RBL Secured Parties.

Having abandoned their argument that their claims were secured, Appellants sought a determination that any royalty shortfalls are monies held in trust by the Debtors for the Royalty Claimants' benefit and are not property of the Wind-Down Debtor's estate. (*Id.*, Bankr. D.I. 337). The Royalty Claimants argued that, under Colorado law, the leases gave them an ownership right over the hydrocarbons and the associated proceeds; therefore, the Royalty Claimants contended, when Debtors received proceeds from sale of hydrocarbons, Debtors held the amounts representing royalty obligations in trust for the Royalty Claimants and did not hold title to those funds in any

9

respect. The Royalty Claimants alleged neither an express or statutory trust. Rather, Royalty Claimants requested that the Bankruptcy Court impose the equitable remedy of the imposition of a constructive trust.

Property held by a debtor is presumed to be property of the estate. *Skilled Nursing Professional Services, A Division of Skilled Nursing Home Care, Inc. v. Sacred Heart Hosp. of Norristown (In re Sacred Heart Hospital of Norristown),* 175 B.R. 543, 555 (Bankr. E.D. Pa. 1994). Royalty Claimants' argument is premised on § 541(d) of the Bankruptcy Code which states, in relevant part:

> (d) Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d). Thus, courts have concluded that property which a debtor holds in trust (express or constructive) for another does not become property of the estate when the debtor files for bankruptcy. *See, e.g., In re Columbia Gas Systems, Inc.,* 997 F.2d 1039, 1059 (3d Cir. 1993) ("Congress clearly intended the exclusion created by § 541(d) to include not only funds held in express trust, but also funds held in constructive trust"). As the Bankruptcy Court correctly observed, imposition of a constructive trust is a court-imposed remedial device to prevent unjust enrichment. (3/11/21 Tr. 11:2-9). "[P]arties seeking to prove a trust relationship typically bear a very heavy burden of proof under both state and federal law." *In re SemCrude, L.P.*, 418 B.R. 98, 106 n.5 (Bankr. D. Del. 2009).

In general, "to establish rights as a trust recipient, a claimant must make two showings: (1) demonstrate that the trust relationship and its legal source exist, and (2) identify and trace the trust funds if they are commingled." *Goldberg v. New Jersey Lawyers' Fund,* 932 F.2d 273, 280

(3d Cir. 1991); *In re Columbia Gas Sys. Inc.,* 997 F.2d 1039, 1063 (3d Cir.1993) ("beneficiaries of trust funds bear the burden of identifying and tracing their trust property"), *cert. denied* 114 S. Ct. 1050 (1994).  The Third Circuit teaches that we look to state law to determine whether the claimant has shown a trust relationship, but that we look to federal law to determine whether the claimant has traced and identified the trust funds.  *City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92 (1994) (citing *Goldberg,* 932 F.2d at 280); *see also Universal Bonding Ins. Co. v. Gittens and Sprinkle Enterprises, Inc.,* 960 F.2d 366, 369 (3d Cir. 1992); *In re Visiting Nurse Ass'n v. Bowen,* 143 B.R. 633, 641 (W.D. Pa. 1992) ("Once a bankruptcy court makes a determination concerning whether a debtor has any legal or equitable interest in property based upon applicable state law, whether the property will come into the estate is a federal question.") (internal quotations and citations omitted), *aff'd,* 986 F.2d 1410 (3d Cir.1993) (table).

The Bankruptcy Court noted that the Royalty Claimants' claims arise out of their "contractual relationship by virtue of the many oil and gas leases" yet the leases at issue do not "demonstrate any retained ownership by the lessor or an expectation of a trust relationship with the lessee."  (3/11/21 Tr. at 8:15-18; *see id*. 8:18-9:6 (discussing particular leases)).  Thus, "[a]s a threshold matter," Judge Shannon emphasized in his ruling that it "is difficult to perceive, as a matter of law" how the Royalty Claimants can be entitled to relief in the form of a constructive trust when their claim "lie[s] not in equity, but at law in action for breach of contract."  (*Id*. at 11:10-19)).  "The contracts do not indicate or permit an inference that the debtor/lessee was holding funds or monies exclusively for the benefit of the lessors."  (*Id*. at 11:17-19).  The Bankruptcy Court ultimately found no predicate for a trust or a constructive trust.

The Royalty Claimants argue that the Bankruptcy Court erred in finding that the imposition of a constructive trust for their benefit was not warranted under these facts.  (D.I. 27 at 13-16).

11

The Royalty Claimants argue that, under two Colorado appellate decisions, *Lawry* and *Yetter*, the imposition of a constructive trust is not precluded simply because the Royalty Claimants are asserting a breach of contract claim. In *Lawry v. Palm*, 192 P.3d 550, 563 (2008), however, the constructive trust was premised on an unjust enrichment claim, not a breach of contract claim. *Id*. at 564. The Colorado Court of Appeals stated "[a] plaintiff is entitled to recover based on the unjust enrichment of a defendant when the plaintiff has **no alternative right under an enforceable contract**." *Id.* (emphasis added). And in *Yetter Well Serv., Inc. v. Cimarron Oil Co.,* 841 P.2d 1068, 1070 (Colo. App. 1992), the underlying cause of action was a fraudulent transfer from Cimarron to a third party, Tandem, and the Colorado Court of Appeals did not impose a constructive trust on amounts held by Cimarron, but rather on interests transferred to the third party, Tandem. *See id*. at 1070-71.

Appellants have failed to establish the considerations warranting imposition of a constructive trust under Colorado law. "A constructive trust . . . can attach to property obtained by fraud, duress, or the abuse of a confidential relationship, or to any other property that 'in equity and good conscience' does not belong to the constructive trustee." *Lawry*, 192 P.3d at 563 (internal citations omitted). "A constructive trust is an extremely flexible remedy, appropriate in circumstances involving fraud or duress, or when a confidential relationship exists, and also to prevent unjust enrichment. It is also appropriate if innocent third persons have subsequently acquired an interest in the property." *Yetter,* 841 P.2d at 1070.

Appellants do not appear to argue that a constructive trust is appropriate here based on fraud, duress, or the existence of a confidential relationship. (*See* D.I. 27 at 13-16; D.I. 31 at 3-4). Further, no claim has been made that the Debtor retained monies at issue with knowledge of some form of a preexisting trust relationship between a third party and the Royalty Claimants. (*See id*.).

12

Appellants argue that controlling Colorado appellate decisions have consistently recognized that a constructive trust remedy is appropriate where "the person holding the [alleged] title to property would profit by a wrong, or be unjustly enriched if he was permitted to keep the property." (D.I. 27 at 15 (quoting *Mancuso v. United Bank of Pueblo*, 818 P.2d 732, 737-38 (Colo. 1991)). But the Colorado cases that the Royalty Claimants cited below—specifically, *Ralston Oil & Gas Co. v. July Corp.,* 719 P.2d 334 (Colo. App. 1985), *Page v. Clark,* 592 P.2d 792 (Colo. 1979), *Mancuso,* and *Yetter*—are distinguishable by facts or circumstances that are not present here. *Ralston* involved a business deal gone wrong between two former friends and neighbors. *See Ralston*, 719 P.2d at 338. There, the court discussed imposing a constructive trust when a confidential relationship between two parties is abused. *Id.* ("Thus, a transfer of property obtained as a result of an abuse of a confidential relationship between two parties may be set aside, and the court may remedy such abuse by imposing a constructive trust"). Similarly, in *Page*, the court and "the parties . . . focused on whether there was a confidential relationship." *Page*, 592 P.2d at 798. In *Mancuso*, the court held summary judgment to be improperly granted against the imposition of a constructive trust under the alternate theories of (i) abuse of a confidential relationship and (ii) a party's knowledge of a preexisting trust relationship with a third party. *Mancuso*, 818 P.2d at 737. And in *Yetter*, the court cited the *Mancuso* case with limited discussion in the context of distinguishable facts. *Yetter*, 841 P.2d at 1070-71 (imposing constructive trust as a remedy under state fraudulent conveyance statute).

Simply put, none of the cited decisions were made in the context of a simple contractual dispute between parties in an arms-length contractual relationship about the payment terms of the relevant contract, and the Royalty Claimants have not met their burden of justifying the imposition of a constructive trust under federal common law or state law.

**B.      Appellants' Arguments Regarding Ownership Under Colorado Law Are Unsupported and Inapposite**

The Royalty Claimants argue that they have a "reserved ownership interest in their percentage royalty share of the proceeds received on Ursa's sale of the natural gas products produced and sold from wells subject to the Royalty Claimants' leases." (D.I. 27 at 8). In support of this argument, the Royalty Claimants cite the Colorado Supreme Court's decision in *Simson v. Langholf*, 293 P.2d 302 (Colo. 1956). (*See id*. at 7-8). In *Simson*, the Colorado Supreme Court distinguished a mineral interest from a royalty interest, quoting the Supreme Court of Oklahoma that explained that under Oklahoma law a royalty interest is "an interest in the proceeds derived from the minerals which a lessee has located, developed and produced." *Id*. at 307. But the Court agrees with the Wind-Down Debtor that *Simson* does not support the Royalty Claimants' contention that they have a ***reserved ownership*** interest in the sale proceeds—nor do any of the other cases cited by the Royalty Claimants. As the Wind-Down Debtor correctly points out, this would be true only if the Debtors held amounts in trust for the Royalty Claimants, which they did not and were not required to do under any law or contract. *See, e.g., In re MCZ, Inc.*, 82 B.R. 40, 42 (Bankr. S.D. Tex. 1987) (finding debtor oilfield operator was a bailee by agreement with working interest owners and had escrowed funds for royalty holders in account for sale proceeds); *Boyd v. Martin Expl. Co.*, 56 B.R. 776, 780 (E.D. La. 1986) (constructive trust placed on overriding royalty interests, not proceeds, based on agreements showing debtor was holding interests for benefit of others); *In re Reichmann Petroleum Corp.*, 434 B.R. 790, 797 (Bankr. S.D. Tex. 2010) (constructive trust on working interests, not proceeds, held by debtor for buyers it had allegedly defrauded).

### C. *Extraction Oil & Gas* Ruling Is Inapplicable

The Royalty Claimants argue that the same issue was decided correctly by the Bankruptcy Court in the *Extraction Oil & Gas* case and this Court should follow suit. (D.I. 27 at 11-12). The Royalty Claimant's reliance is misplaced. After careful consideration of that ruling, Judge Shannon observed that "[t]he Extraction case does not stand for the proposition that unpaid or underpaid royalties are funds that are not property of the debtor's estate." (3/11/21 Tr. 12:10-12).

In that case, in the context of a plan confirmation hearing, the royalty holders at issue objected to language in a proposed plan of reorganization which would have deemed them general unsecured creditors, all before the issue had been litigated or their claim had otherwise been determined. *See In re Extraction Oil & Gas, Inc., et al.*, No. 20-11548 (CSS) (Bankr. D. Del. Dec. 28, 2020), Bankr. D.I. 1534 (12/22/20 transcript of confirmation hearing) at 35:21-36:2). The court agreed with the royalty holders' position that it would be premature to classify them in the plan as general unsecured creditors before determining the bona fides of their allegations. (*Id*. at 87:10-88:24). The royalty holders did not seek to prove that they had a fiduciary or trust relationship with the *Extraction* debtors, and the court did not rule on, or otherwise consider, whether the property was actually property of the estate or not. (*Id*.) The court was resolving an objection to confirmation of a plan of reorganization and nothing more; it was not determining the actual validity of their claims. (*Id*. 35:21-23, 87:10-88:24). The Royalty Claimants' reliance on the *Extraction* is misplaced.

The Court agrees with the Wind-Down Debtor that a more applicable case is *Southland Royalty Co.*, in which royalty claimants initiated adversary proceedings also alleging underpayment of royalties. As is the case here, the dispute in *Southland* turned on whether any underpayment claims represented by proceeds received by the Southland debtors were property of

15

the bankruptcy estates, and the court considered cross-motions for summary judgment. *In re Southland Royalty Co., LLC*, Case No. 20-10158 (Bankr. D. Del. May 14, 2021), Bankr. D.I. 1677 ("5/12/21 Tr.") at 46:23-47:2). Following full briefing and a hearing, the court held that the funds sought by the royalty claimants were property of the debtor's estate, not funds constituting property of the royalty claimants. (*Id*. at 58:2-4). Royalty Claimants argue that the Southland decision is not instructive because the oil and gas properties in *Southland* are in New Mexico. (D.I. 31 at 7). The Court disagrees. The *Southland* ruling was grounded in the same tenets as Judge Shannon's in this case—that, first, applicable state law only grants the claimant a right to a contractual stream of royalty payments, not a property interest in the oil and gas (5/12/21 Tr. at 49:2-5), and second, the leases in question did not establish a constructive trust relationship (*id*. at 52:25-53:10).

D.      **Royalty Claimants' Reliance on the Debtors' First Day Motion Is Misplaced**

Finally, Royalty Claimants cite a first day motion filed by Debtors which sought authority to continue making royalty payments (*Ursa Piceance* Bankr. D.I. 11) ("the Royalty Motion"):

> (1) Ursa "only take[s] possession of the proceeds from the sale of the Royalty Interest Owners' . . . share of oil and gas production because [Ursa] market[s] and sell[s] the oil and gas production before remitting the Royalty Payments to them" (*id*. at 14-15); and
>
> (2) "[T]o the extent [Ursa has] proceeds of the Royalty Interests in [its] possession, [Ursa] may hold only bare legal title to the oil and gas production attributable to the Royalty Interest Owners" (*id*. at 13).

As the Bankruptcy Court noted:

> The claimants justifiably accord significance to the fact that the debtors, in various first day critical payment motions, stated that undisputed royalty amounts should be paid under the doctrine of necessity in part on the ground that royalty amounts "could be argued to not be property of the debtor's estate"; however, the court is also obliged to accord weight to the debtor's reservation contained in each of these motions that its qualified statements cannot constitute admissions by the debtor as to ownership and property of

16

> the estate. Accordingly, the quoted language from the first day motions is certainly not dispositive of the direct question that is before the court today.

(3/11/21 Tr. at 10:2-14). According to the Royalty Claimants, Debtors' statements in support of the Royalty Motion were made in accordance with relevant facts and applicable Colorado law, Debtors have never sought to withdraw or correct any of these statements, and the Bankruptcy Court improperly disregarded them. (*See* D.I. 31 at 7-8).

The Court agrees that Royalty Claimants' reliance on the Royalty Motion is misplaced. The Royalty Motion explains the legal risk of stopping payments that could lead to costly and unnecessary disruptions to the bankruptcy process, such as litigation. The excerpted statements address ***undisputed*** royalty amounts, and outlining potential claims available to royalty holders in the event payments are stopped is not an admission of those claims' validity. Indeed, the excerpts quoted by the Royalty Claimants are couched in qualifying language such as "***may*** hold only bare legal title," "***could be*** argued to exclude . . . from property of the estate." More importantly, Royalty Claimants have ignored a critical statement that applies to all of the excerpts: "Nothing in this [Royalty] Motion shall constitute an admission or acknowledgment by the Debtors that any Royalty Interest or Working Interest, or any cash or assets relating thereto, do not constitute property of the Debtors' estates under § 541 of the Bankruptcy Code." (Royalty Motion ¶ 8 n.3).

### IV. CONCLUSION

The Royalty Claimants have not carried their burden to warrant imposition of a constructive trust, and the Order will be affirmed. An appropriate order follows.

17